FILED-EDA

2005 JAN 24 PM 4: 05
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION U.S. DISTRICT COURT

CAROLYN CALENDER, THEODOSHIA
KNAULS, MICHAEL MARION, RONNIE
MITCHELL, EVALEAN MOORE, BRIAN
TODD, RALPH WILSON, WILLIE WILSON,
individually and on behalf of all others similarly
situated,

          Plaintiffs,

v.

THE BOEING COMPANY and McDONNELL
DOUGLAS CORPORATION,

          Defendants.

**05C  0411**

Case No.
CLASS ACTION
COMPLAINT

JUDGE JUDGE DARRAH.

MAG. DISTRICT JUDGE MASON

## I.    NATURE OF THE CASE

1.    Plaintiffs bring this action individually and on behalf of all African-Americans

similarly situated, seeking relief from systemic discriminatory employment practices by The

Boeing Company, McDonnell Douglas Corporation, and Boeing North American, Inc.

2.    The plaintiffs and the members of the subclasses have been treated differently

than similarly situated Caucasian co-workers. The plaintiffs and the members of the subclasses

have been denied, based on their race, desirable job assignments, promotional opportunities,

management positions, training, equal pay, comparable retention ratings, bonuses and other

benefits of employment. Defendants have deterred African-American employees from seeking

promotions, management positions and desirable job assignments; failed to select African-

Americans for desirable job assignments; failed to effectively enforce policies prohibiting race

discrimination; and retaliated against African-American employees who have protested Defendants' discriminatory policies, patterns, and/or practices.

3. Defendants have consistently ignored complaints about these unlawful work conditions, inadequately investigated African-Americans' complaints, and failed to implement steps that would eliminate these unlawful working conditions.

4. Defendants' internal surveys, and the studies of their hired consultants, show race discrimination against African-Americans in promotion, pay and other practices.

5. While Defendants may have strongly worded anti-discrimination policies, and many of their employees honor the rights of their African-American co-workers, far too many of their managerial and supervisory employees are not effectively policed, are rarely disciplined for violating the rights of African-Americans, and ignore Defendants' stated policies and make employment decisions disadvantageous to African-Americans. When management or co-workers are disciplined for violating African-Americans' rights, the discipline is often too lenient to deter future illegal conduct. It is common knowledge that if African-Americans complain about co-worker or managerial misconduct, they may be ostracized and denied meaningful future employment opportunities at Boeing. African-Americans, rather than perpetrators, frequently are punished by being reassigned to jobs and places that under-utilize their skills and make future advancement even more difficult.

6. Co-workers frequently verbally harass their African-American co-workers with derogatory words such as "nigger," "Jungle Bunnies," and "monkey," which has fostered a hostile work environment.

7. In failing adequately to protect the rights of their African-American workers, and in permitting an environment in which their self-esteem and value are questioned, Defendants

have injured not only African-American workers but their families and loved ones as well; have denied their spouses, loved ones, and children the income due these family units; and, in doing so, have impaired their emotional relationships with their spouses, loved ones, and children.

## II.  JURISDICTION AND VENUE

8.      This court has jurisdiction pursuant to 28 U.S.C. § 1331, 1343, and 1367, and 42 U.S.C. § 2000e-5(f)(3).

9.      Venue lies in this district pursuant to 28 U.S.C. § 1391.

## III.  THE PARTIES

10.      The plaintiffs are African-American who have suffered racially discriminatory employment policies and practices at the hands of the defendants and their predecessors-in-interest (collectively "Defendants").  The plaintiffs comprise both hourly and salaried workers who work or worked at non-heritage Boeing sites ("non-heritage Boeing" refers to the McDonnell Douglas Corporation, and to segments of Rockwell International Corporation that became Boeing North American, both before and after Boeing acquired those companies).  They are qualified persons who have been denied the opportunity for promotion, equal pay, who have been injured because of low retention ratings, who have been laid off unfairly, who have been subjected to a hostile work environment, and/or who have been retaliated against because of Defendants' policies and practices of racial discrimination.

11.      Plaintiff Carolyn Calender resides in Florissant, Missouri.

12.      Plaintiff Theodoshia Knauls resides in Tulsa, Oklahoma.

13.      Plaintiff Michael Marion resides in St. Louis, Missouri.

14.      Plaintiff Ronnie Mitchell resides in Tulsa, Oklahoma.

15. Plaintiff Evalean Moore resides in St. Louis, Missouri.

16. Plaintiff Brian Todd resides in Los Angeles County, California.

17. Plaintiff Ralph Wilson resides in Tulsa, Oklahoma.

18. Plaintiff Willie Wilson resides in Tulsa County, Oklahoma.

19. Defendant The Boeing Company ("Boeing") is a Delaware corporation doing business in Alabama, California, Kansas, Missouri, Oklahoma, Pennsylvania, Washington, and other states. Boeing is engaged in interstate commerce and employs approximately 238,000 persons in the United States, primarily providing aircraft, aerospace and related technology, and other products. Unless stated otherwise, references to defendant Boeing include all of its successors, predecessors, affiliates and subsidiaries.

20. Defendant McDonnell Douglas Corporation ("MDC") is a Maryland corporation and wholly-owned subsidiary of Boeing doing business in southern California, St. Louis, Missouri, and Arizona. Boeing acquired MDC in August 1997. MDC and defendant Boeing are liable jointly and severally for all the violations alleged herein with respect to plaintiffs and the members of the subclasses employed at facilities owned or operated in whole or in part by MDC. Unless stated otherwise, references to MDC include its successors, predecessors, affiliates and subsidiaries. MDC is engaged in interstate commerce and employs thousands of persons in the United States. MDC and Boeing are jointly and severally liable for the discriminatory practices and policies of MDC's predecessors-in-interest to the extent they employed any of the plaintiffs or the members of the subclasses.

21. Boeing North American, Inc. ("BNA") was a Delaware corporation and wholly-owned subsidiary of the defendant Boeing doing business in California, and Tulsa, Oklahoma until 2000. In December 1996 Boeing acquired portions of Rockwell International, which then

became BNA   BNA, which no longer exists, was engaged in interstate commerce and employed thousands of persons in the United States. Boeing is liable for all the violations alleged herein with regard to plaintiffs and the subclasses employed at facilities that were owned or operated in whole or in part by BNA or its Rockwell International predecessors. Unless stated otherwise, references to BNA include its successors, predecessors, affiliates and subsidiaries. Boeing is liable for the discriminatory practices and policies of BNA's predecessors-in-interest to the extent they employed any of the plaintiffs or members of the subclasses.

22.     The Ninth Circuit noted in *Staton v. The Boeing Company*, 327 F.3d 938, 954 (9th Cir. 2003), that "Boeing is responsible for the employment practices of all its sub-parts."

## IV.     SUBCLASS ALLEGATIONS

23.     Plaintiffs sue on their own behalf and on behalf of subclasses of persons pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3).

24.     Plaintiffs bring this complaint on behalf of the following proposed subclasses, defined as:

a.     All African-Americans who are or were employed by MDC or by Boeing at a site formerly operated by MDC. For the compensation claim on behalf of salaried employees, the class period is from February 20, 1996 to the present ("Compensation Subclass Period"). For all other claims, the class period is from June 6, 1994, to present ("Subclass Period"). This subclass is referred to as the "MDC Subclass;" and

b.     All African-Americans who were employed by BNA or by Rockwell International (limited to Rockwell International sites acquired by Boeing) or who are or were employed by Boeing at any site formerly operated by BNA. For the compensation claim on

behalf of salaried employees, the class period is from February 20, 1996 to the present. For all other claims, the class period is from June 6, 1994, to present. This subclass is referred to as the "BNA Subclass."

25. Plaintiffs seek class certification with respect to their claims for violation of Title VII of the Civil Rights Act of 1964, as amended, and violation of 42 U.S.C. § 1981, as amended.

26. There are thousands of subclass members, residing in numerous states, including but not limited to California, Missouri, and Oklahoma. The subclasses are so numerous and geographically distributed that joinder of all members of the subclasses is impracticable.

27. Questions of fact and law common to the members of each of the subclasses include, among others:

a. whether African-Americans have not obtained the promotions, salary, retention ratings, and job opportunities obtained by equally or less qualified white employees, and were being laid off at a higher rate than equally or less qualified Caucasians;

b. whether Defendants' conduct alleged in this complaint violates Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, as amended;

c. whether Defendants have intentionally carried out racially discriminatory policies and practices alleged in this complaint;

d. whether Defendants' policies and practices have resulted in disparate impact on the basis of race;

e. whether Defendants' policies and practices are consistent with business necessity;

f. whether Plaintiffs and the members of the subclasses are entitled to back pay, benefits and lost wages, and if so, in what amounts;

COMPLAINT

- 6 -

g.     whether Plaintiffs and the members of the subclasses have sustained damage and, if so, in what amounts; and

h.     whether Defendants' current policies and practices affecting Plaintiffs and members of the subclasses should be eliminated and replaced by new policies and practices and, if so, which ones.

28.     Plaintiffs' claims are typical of the claims of the members of the subclasses.

29.     Plaintiffs and counsel for the subclasses will fairly and adequately protect the interests of the members of the subclasses.

30.     Defendants have acted/refused to act and are acting/refusing to act on grounds generally applicable to the members of the subclasses, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the subclasses.

31.     Common questions of fact and law predominate over questions affecting only individual members.

32.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

33.     There are no unusual difficulties likely to be encountered in the management of this litigation as a class action.

34.     Notice to the members of the subclasses (if deemed necessary) may be accomplished inexpensively, efficiently and in a manner best designed to protect the due process rights of all members of the subclasses by means of written notices supplied through Defendants' system of communication with their employees or through notice to the last known address of former employees.

## V.    FACTUAL ALLEGATIONS

35.    During the Subclass Periods, thousands of African-Americans have worked for Defendants. Defendants have perpetrated a company-wide pattern and practice of illegal racial discrimination against African-American workers.

### A.    Boeing Executives Have Ignored Longstanding Knowledge of Racial Discrimination

36.    Boeing executives at its Chicago (formerly Seattle) headquarters have had longstanding knowledge of racial discrimination across the company's facilities, and failed to take any serious action. Boeing has engaged in this discrimination intentionally and with malice, reckless disregard, or deliberate ignorance of the federal and state rights of its African-American workers.

37.    At least since 1995, Boeing periodically performed internal company-wide analyses of disparities in salaries between Caucasians and African-Americans and other gender, racial or ethnic groups. These analyses found that consistently through the 1990s, African-Americans were paid less than their Caucasian counterparts at Boeing.

38.    Boeing also studied the rates at which minorities and non-minorities were promoted. Like the salary studies, the promotion studies showed that blacks were consistently promoted less than similarly situated whites.

39.    An internal Boeing e-mail dated January 9, 1998 also revealed findings of racial bias in a Boeing internal survey of affirmative action issues. In the e-mail, a Seattle management official, Gary Hart, reported as follows:

> A survey of Boeing's affirmative issues were found to be as follows:

| Subject Areas | Finding |
| --- | --- |
| *Hiring practices* | *Racial bias* |

| | |
|---|---|
| *Pay practices* | *Gender Bias* |
| *Promotion practices* | *Gender and racial bias* |
| *Peer working environment* | *Race issues* |

Hart reported that Boeing recognized that "[o]ur behaviors have to change to a focus on evaluating what people are doing to accomplish the job they were hired to do, not evaluating their appearance, or method of expressing themselves."

40.     Nonetheless, Boeing executives did not empanel a team to examine why minorities were paid and promoted less than whites until 1998. Once formed, this team, known as the "DSA" or "PAT" team, surveyed the results of Boeing's prior studies, beginning with those from the early to mid-1990s. In addition, it conducted "subject matter expert" interviews at non-heritage Boeing sites, such as McDonnell Douglas, and Boeing North American sites. In mid-1998, the DSA/PAT team delivered a report and recommendations on the key "root causes" of the salary and advancement disparities that harmed African Americans. These "root causes" included:

- "Starting salaries for *experienced* new hires are generally lower for women and minorities."

- Minority engineers are "more often in lower paying skill codes."

- "Existing salary planning processes do not tend to reduce (and often *increase*) these disparities."

- "Uniform fund generation by percentage [*i.e.*, giving each grouping of employees the same percentage share of the annual salary increase fund] is actually a systemic root cause!"

- "No managerial monitoring for EEO issues."

- "No direct link between compensation and performance management."

41.     Boeing's internal DSA/PAT team also determined that "[s]tatistically significant or not, the observed salary differences [were] consistently adverse to protected groups."

Minorities were "more often [placed] in lower paying skill codes." Boeing's "salary planning create[d] significant differences" in salaries between blacks and whites, and over time the "[i]nitial differences continue and [were] exacerbated." "Few persons, especially women and minorities, are hired into management." Boeing had absolutely "[n]o managerial monitoring for EEO issues." Moreover, "the integrity of performance ratings is dubious."

42.     Faced with this evidence, Boeing made the fateful decision to conceal the discrimination from its employees and suppress its own findings. The DSA/PAT team's findings, and its recommendations, were presented in mid-1998 to James Dagnon, the most senior Boeing executive responsible for ensuring that Boeing's Human Resources practices were non-discriminatory. Despite those results, Mr. Dagnon stated the following in a May 1998 newsletter to Boeing employees:

> ...[L]et me emphasize that *at no time has Boeing done a companywide analysis and found that gender or racial bias exists*. Any implications to the contrary are incorrect[.]

Later, in 2000, Mr. Dagnon's organization told the Boeing workforce that Boeing does not pay women or African Americans less than white males for doing the same work.

43.     In fact, Mr. Dagnon knew that blacks were being paid less than whites and that Boeing's practices were not "legally defensible." In 1998, Mr. Dagnon's staff advised him that "[o]ur compensation data could be interpreted to support unbelievably large financial damages by an Agency or plaintiffs." In February 1999, Mr. Dagnon saw charts setting out salary disparities adverse to blacks for most of Boeing's populations at most of its major heritage and non-heritage sites, including but not limited to Missouri, California, and Oklahoma. In November 1999, one of Mr. Dagnon's chief lieutenants, Boeing's Director of Employee

1669.10 0140 BSC.DOC

Relations, reported that Boeing's statistical analyses "suggest that there's something generally not right about the way we're doing" the compensation processes.

44.    Instead of addressing these problems, senior Boeing officials decided to hide the problems in order to minimize its potential liability. Fearful of a class action discrimination suit, Boeing concealed its "fixes" (Boeing's own term) from the rank and file.

45.    Despite this purported recognition, racial discrimination at Boeing continued unabated. The perception at various Boeing sites was that race and/or gender influenced career progress. Indeed, Boeing calculated that it might take $80 to $120 million ("and we thought ... that number could be a lot higher") to make backpay and prospective salary adjustments sufficient to eliminate pay disparities. In November 1999, Boeing entered into a settlement of racial and gender discrimination charges with the U.S. Department of Labor. That year, Boeing allocated approximately $11 million in 1999 to reduce – *not* eliminate – the disparities. In 2000, as a result of the settlement agreement with the U.S. Department of Labor, it was forced to pay an additional $22 million. Boeing also agreed to make across-the-board salary adjustments for minorities, conduct internal monitoring, and report its results to the Department of Labor. In addition, Boeing agreed to create a $4.5 million pool of funds to pay back pay and salary adjustments to salaried and executive minority and female employees who had been victims of salary inequities. Also, under the settlement, Boeing was required to track the race and gender of job applicants and maintain the criteria used in generating candidates for openings. Yet these changes did not bring Caucasian and African-Americans at Boeing to a level of parity with respect to compensation, promotions, and other employment benefits. Finally, in 2004, when forced to choose between settling or going to trial, it settled with a class of women employees from the Puget Sound for approximately $72 million.

1669.10 0140 BSC 0CC

46.     There have been statistically significant disparities in salary and promotions of African-Americans compared to similar Caucasian employees at former MDC and BNA sites since the start of the Subclass Periods.

## B.     Boeing's Facilities Follow Common Compensation, Promotion, and Other Employment Policies and Practices

47.     Boeing's compensation policies were centrally formulated at Boeing's headquarters in Seattle, Washington. These policies were common in important respects across its facilities nationwide.

48.     Boeing's website affirmed the commonality of its compensation policies for salaried employees. It stated:

> The salary planning processes used for the company's four salary payrolls are fundamentally very similar, based on a single company-wide compensation philosophy for salaried payrolls. The fact that actual implementation schemes for the four payrolls have been tailored to the unique characteristics of each payroll, and go by different names, can sometimes create the false impression of fundamental differences where none exists.

49.     Since 1999, Boeing's headquarters has issued annual "Management Guides" relating to the annual salary planning process at all of its sites. These Management Guides apply nationwide.

50.     The central factor for the salary-planning process used by Boeing was that salary was based on the employee's performance relative to other employees performing similar work. Boeing also had two corollary policies: that it would manage salaries, not raises, and that salaries were set within an approved range that represented the employee's market value.

51.     Promotion policies for non-management employees also were common in critical respects across Boeing's facilities nationwide. Boeing incorporated specific controls into its

COMPLAINT                                                    - 12 -

promotion policies for first-level management selection process to guard against excessive subjectivity by the promoting official. Yet, it imposed no such controls on its promotion policies for non-management positions, whether for competitive promotions for salaried employees, competitive promotions for hourly employees, or non-competitive promotions for salaried employees. This resulted in managers having the freedom to follow their own rules in selection for promotions and often fostered an "old boy" system and favoritism that adversely affected African-American candidates.

52.    For example, for non-management positions, Boeing's policy stated that a manager must post – or advertise – job vacancies. However, this policy was subject to numerous exceptions, and the exceptions often swallowed the rule. These exceptions left managers with broad discretion in deciding when to post and when not to post and enabled them to direct promotions to friends and family, resulting in racial discrimination.

53.    In addition, Boeing did not require that managers interview a group of candidates for a competitive opening. To the contrary, the reference to interviews in the list of "management responsibilities" in Boeing's 1999 company-wide promotion policy was deleted when it issued its updated version in 2000. When managers did conduct interviews, they were not required to use structured questions asking all candidates the same questions. A manager could ask one candidate about educational background and another about golf scores.

54.    Career progression was minimal for minorities, including African-Americans, who did not advance to management positions. African-Americans were kept at lower-level jobs longer than other similarly situated workers, in spite of the fact that these African-American employees were qualified and applied for advancement. The experiences of the plaintiffs and members of the subclasses were typical. African-Americans watched as co-workers were

1669.10 0140 BSC.DOC

promoted above them. Often African-Americans trained co-workers who later became their superiors. When these African-Americans complained about promotions being based on race, not on job-related criteria, Boeing management responded they can "hire who they want."

55.     Boeing did not maintain uniform rules at its sites governing which candidates were interviewed or what to ask the candidates.

56.     Further, African-Americans employees found it much more difficult than their similarly situated Caucasian co-workers to obtain training necessary to compete for promotions. For example, African-Americans were told that training classes were "full," when they applied for admission, but these same classes accommodated Caucasians who later sought admission. African-Americans were told that certain training classes were necessary for advancement. However, the same training requirements were not applied to similarly qualified Caucasians seeking a promotion.

57.     Boeing headquarters also failed to impose review procedures for promotion selections at its sites to ensure accountability. In addition, the Company failed to prescribe written criteria for selection decisions. These two failings again resulted in promoting officials having wide discretion to use whatever selection criteria they wished and fostered favoritism that inured to the benefit of Caucasians.

58.     African-Americans started their careers at Boeing at a financial disadvantage. There were racial differences in initial pay code assignments. And, starting salaries for experienced new hires were generally lower for minorities and women. The differences in starting salaries tended to track with employees throughout their careers and therefore, African Americans starting low, stayed low. In fact, racial differentials in salaries were generally larger

and more statistically significant for longer-term employees than shorter-term employees. Minorities and women typically continued to maintain lower paying jobs.

59.    African-Americans were often not paid according to their assigned tasks. Boeing management channeled African-Americans to lower-paying positions, but often expected these employees to perform higher-level tasks. However, if a Caucasian performed higher-level work, he or she typically was promoted with increased pay. Boeing's salary planning processes often increased these disparities in pay. For minorities, like African-Americans, salary planning created significant differences in salaries.

60.    African-Americans received lower retention ratings than equally or less qualified Caucasians. Lower retention ratings made African-Americans more susceptible to lay-off. Also, lower retention ratings hindered African-Americans' eligibility for certain other benefits. African-Americans were laid-off at a disproportionately higher rate than their Caucasian counterparts.

61.    African-Americans were subjected to a racially hostile work environment at Boeing that included, but was not limited to, racial slurs, crude and racist drawings, and other intimidating tactics. For example, African-Americans were subjected to derogatory statements, such as "KKK wants you," and "This Is Get A Nigger Day." African-Americans observed the widespread use of racially derogatory graffiti in Boeing's workplace, including words and statements such as "KKK," "the lashings will continue until attitudes change," and "Nigger we don't want you here." Some African-Americans found actual hangman nooses on their coffee cups and toolboxes. A Black doll with a noose was hung at an African-American foreman's desk. Other comments African-Americans were subjected to on a regular basis included "nigger," "Jungle Bunnies," "monkey," "Black boy," "dumb Black Bitch," "nigger pick that up,"

and "chicken shit niggers." The racially hostile work environment was not only created by Caucasian co-workers, but also by Caucasian management-level employees. Boeing management allowed the racially hostile work environments to flourish unabated.

## C.   Boeing's Employment Policies Have Allowed Managers to Exercise Excessive Subjectivity and Fostered Pay and Promotion Decisions That Discriminate Against African-Americans

62.    The excessive subjectivity permitted by Boeing's employment rules and procedures resulted in managers giving benefits to friends and family and promoted an "old boy" network that adversely affected African-Americans.

63.    The excessive subjectivity given to managers by Boeing's employment procedures was exhibited in numerous areas, including the following:

(1)    No rules governed the practices of Boeing's salary review groups, by which Caucasian and African-American employees salaries and pay raises were set;

(2)    No formal training on how to conduct salary planning. Thus, individual organizations and managers have had "a whole lot of discretion" in conducting salary reviews, in the criteria to be used for comparative judgment calls, and in placing employees within their peer salary ranges.

(3)    No fixed rules governed whether job openings were advertised;

(4)    No fixed rules prescribed whether selecting officials must interview job candidates;

(5)    No the tools, such as standardized racial tracking processes, to determine if its hiring decisions and promotions were fair;

(6)    No fixed rules prescribed what selecting officials could ask job candidates in interviews;

(7)     No written criteria existed for promotion or hiring selection decisions;

(8)     No Boeing headquarters' procedures existed for review of promotion

decisions; and

(9)     No meaningful guidance circumscribed managers' discretion in giving

non-competitive increases in salary and pay grade.

64.     Boeing documented that managers across the company disregarded the few

restrictions contained in Boeing's written promotion procedures. Boeing policy required that

employees submit a written application or request in order to be considered for competitive

promotions. A senior Boeing official stated, however, that at least until 1999 managers bypassed

these application processes and selected whomever they wished:

> [T]he staffing process failed to hold managers accountable. There
> were no apparent safeguards in place.... *[T]here was no*
> *requirement for hiring managers or the company offices to*
> *follow established procedures* or to go through the Shared
> Services Group (SSG). The processes were there but were not
> adhered to and there were no tie-ins. [The] Employment [Office]
> or [HR] were often distrusted by hiring managers. At Boeing, "the
> hiring community here" (hiring managers) view the employment
> process as ineffective. The result of this lack of faith in the process
> and in SSG was that *candidate pools were often developed by*
> *hiring managers independent of the "employment process." This*
> *was reflected in the limited candidate pools even though there*
> *was "underutilization" in a myriad of jobs at Boeing.*

65.     This excessive subjectivity denied plaintiffs and the members of the subclasses

the same compensation, promotions, and employment benefits as Boeing made available to

Caucasians and violated their rights under federal and state law.

**D.    Boeing Has Failed to Address African-American Employees' Complaints of Racial Discrimination**

66.    Reports to Boeing of adverse impact and/or treatment regarding promotion, training, compensation, demotions, terminations, and hostile work environment go unheeded; are simply ignored or responded to with a form denial; are investigated only in a cursory fashion; and/or are ineffectively treated. The defendants used inconsistent EEO Investigation Guidelines in reviewing complaints by the African-American employees that they are treated differently than Caucasians. Some African-Americans experienced retaliation for asserting complaints of racial discrimination. In spite of official statements that defendants support equal treatment for African-Americans, the message clearly communicated to workers is that racial discrimination against African-Americans is standard operating procedure, and will not generally result in any significant, adverse employment action.

67.    Indeed, before 1995 and thereafter, African-American employees have complained to defendants that they have not been treated equally as similarly situated Caucasians.

**E.    Boeing's Tolerance of Racial Discrimination Has Infected All Aspects of Its Employment Practices Affecting African-Americans**

68.    Boeing has pursued, condoned, acquiesced in, and/or failed to eliminate continuing policies and/or patterns or practices that, though often facially neutral, have adversely impacted defendants' African-American employees and/or that have the intent and effect of denying African-Americans equal job opportunities and conditions of employment. These policies or practices include, without limitation:

(1)     failing and/or refusing to implement or enforce and follow a uniform posting procedure to ensure that all employees have or had equal notice of job openings and promotions;

(2)     failing and refusing to establish and/or enforce a uniform and unbiased process by which Caucasian and African-American employees can apply and compete equally for promotions, and training opportunities;

(3)     using a forced curve for compensation, retention, and termination decisions;

(4)     failing to conduct meaningful performance reviews and informing employees about how to improve their performance;

(5)     preselecting employees for promotions and favorable work opportunities;

(6)     promoting individuals into managerial and supervisory positions without determining or attempting to evaluate whether they are racially-biased;

(7)     promoting racially-biased individuals into managerial and supervisory positions;

(8)     relying upon subjective, racially-biased and/or arbitrary criteria used by a predominately Caucasian managerial work force in making job assignment, compensation, training, termination, and promotional decisions;

(9)     failing and refusing to consider African-American employees for desirable work assignments, promotions and management positions on the same basis as Caucasian employees are considered;

(10)    discouraging and deterring African-American employees from applying for desirable assignments, promotions and management positions for which they are qualified;

(11)    failing and refusing to provide African-American employees with the necessary work experience and training to qualify them for more desirable positions on the same basis as Caucasian employees are provided with such experience and training;

(12)    paying African-American employees less than similarly situated Caucasian employees;

(13)    retaliating against or permitting others to retaliate against African-American employees who protest the defendants' discriminatory policies and/or patterns or practices;

(14)    demoting African-American employees or reclassifying their jobs when similarly situated Caucasians do not experience the same degree of demotions or reclassifications;

(15)    assigning African-American employees retention ratings that are more disadvantageous to them than those assigned to similarly situated Caucasian employees; and, because of those ratings, there are a disproportionate and unfair number of African-American terminations;

(16)    subjecting African-American employees to different and more rigorous requirements in order to be eligible for promotional or other job opportunities than those to which Caucasians are subjected;

(17)    failing to provide African-American employees with timely and accurate notice of employment opportunities;

(18)     subjecting African-American employees to a sexually hostile and sexually harassing work environment;

(19)     denying African-Americans the more desirable work hours and work shifts;

(20)     failing to implement effective anti-discrimination investigation and penalty programs; and

(21)     failing to monitor and correct the practices of their employees, which adversely impact African-American employees.

69.     Defendants' pattern and practice of illegal employment racial discrimination has persisted for decades, and continues to the present date, both with regard to the plaintiffs and the members of the subclasses.

70.     Defendants' pattern and practice of racial discrimination has injured plaintiffs and the members of the subclasses in various ways. By failing to promote plaintiffs and other African-Americans, subjecting them to a hostile work environment, and subjecting them to different terms and conditions of employment, Boeing has at the very least cost the plaintiffs and the members of the subclasses significant income and benefits to which they are entitled. But the injuries are not limited to sums appearing on a pay stub. The racial discrimination has devalued the plaintiffs and the members of the subclasses by telling them they are not worth as much as Caucasians. This has caused immense harm, including physical and emotional pain and suffering.

**F.     Each Plaintiff Has Experienced Unlawful Treatment as a Result of Defendants' Corporate Policies**

71.     Each Plaintiff has experienced racially based discriminatory treatment.

72.    Willie Wilson has worked for Boeing or one of the companies it acquired for more than 20 years. Mr. Wilson was not promoted because, among other things, positions for which he was qualified were filled by Caucasians before the jobs were posted. Mr. Wilson has applied for a supervisory position, which was filled by a less qualified Caucasian. Boeing has failed to promote Mr. Wilson, and has subjected him to different conditions of employment than his Caucasian coworkers, based on race. Mr. Wilson was paid less in salary than similarly situated Caucasians.

73.    Brian Todd has worked for Boeing or one of the companies it acquired for more than 15 years. He applied for promotions in the late 1990's. On several occasions, a similarly situated Caucasian worker with less seniority was promoted over Mr. Todd. Mr. Todd has also been subjected to racial harassment, against which Boeing refused to take action. Boeing has failed to promote Mr. Todd, and has subjected him to different conditions of employment than his Caucasian coworkers, based on race.

74.    Carol Calender has worked for Boeing or one of the companies it acquired since 1995. She has applied for promotion and been denied. She trained a Caucasian female who became a full-time employee and was promoted three grades higher than Ms. Calender, even though Ms. Calender had more experience and seniority. Boeing has failed to promote Ms. Calender, and has subjected her to different conditions of employment than her Caucasian coworkers, based on race.

75.    Michael Marion worked for Boeing or one of the companies it acquired from 1984 to 2000. He applied for promotions but was kept in the F-15 Final Assembly Department, while Caucasians with less experience and seniority were promoted. Mr. Marion was denied promotions and was subjected to different conditions of employment based on race.

COMPLAINT                                                                  - 22 -

76.     Evalean Moore has worked for Boeing or one of the companies it acquired since 1968. Ms. Moore has applied for several promotions. In August of 1998, she applied for a superintendent position for which she has not received a response. Currently, she is a manufacturing engineer. Ms. Moore was paid less in salary than similarly situated Caucasians. Caucasian employees with less experience and less seniority have been given the positions Ms. Moore applied for. Several of those promoted Caucasian employees were trained by Ms. Moore, who has been subjected to different conditions of employment based on race.

77.     Theodoshia Knauls has worked for Boeing or one of the companies it acquired since 1985. She is an accounting associate. She has applied for several promotions. In most cases, she was not even given an interview. Caucasians with less experience and seniority are given the promotions. Ms. Knauls has been subjected to different conditions of employment based on race.

78.     Ronnie Mitchell has worked for Boeing or one of the companies it acquired in Oklahoma since 1984. He is a machinist. He has applied for at least two promotions. A Caucasian who had severe disciplinary problems was given the position. Mitchell had at least as much experience and seniority. This Caucasian employee has now become Mr. Mitchell's supervisor. This same employee has physically assaulted Mitchell and another African American employee. Mitchell has been subjected to different conditions of employment based on race.

79.     Ralph Wilson has worked for Boeing or one of the companies it acquired since 1980. He is a toolmaker who has also been on assignment in Seattle. Mr. Wilson has applied for promotions. Caucasians with less experience and seniority have been given the promotions. Wilson has been subjected to different conditions of employment based on race.

## FIRST CAUSE OF ACTION

## VIOLATION OF 42 U.S.C. § 1981

80. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

81. This Count is brought on behalf of Plaintiffs and members of the subclasses.

82. Defendants have denied Plaintiffs and members of the subclasses the same right to make and enforce contracts as enjoyed by white citizens employed by Defendants, including rights involving the making, performance, modification, and termination of contracts with Defendants and the enjoyment of all benefits, privileges, terms, and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended. The members of the subclasses have suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

83. In the employment practices described above, Defendants intentionally engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiffs and the members of the subclasses, entitling Plaintiffs and the members of the subclasses to punitive damages.

84. By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Plaintiffs and members of the subclasses, Plaintiffs and the members of the subclasses are entitled to application of the continuing violations doctrine to all violations alleged herein.

85. As a result of Defendants' conduct alleged in this complaint, Plaintiffs and the members of the subclasses have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

COMPLAINT

- 24 -

86. By reason of Defendants' discrimination, Plaintiffs and members of the subclasses are entitled to all legal and equitable remedies available for violations of section 1981, as amended, including an award of punitive damages.

87. Attorneys' fees should be awarded under 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

88. Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

89. This Count is brought on behalf of Plaintiffs and all members of the subclasses.

90. Defendants have discriminated against Plaintiffs and members of the subclasses in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, by subjecting them to different treatment on the basis of their race. The members of the subclasses have suffered both disparate impact and disparate treatment as a result of Defendants' wrongful conduct.

91. In the employment practices described above, Defendants intentionally engaged in discriminatory practices with malice or with reckless indifference to the federally protected rights of Plaintiffs and the members of the subclasses, entitling Plaintiffs and the members of the subclasses to punitive damages.

92. By reason of the continuous nature of Defendants' discriminatory conduct, persistent throughout the employment of Plaintiffs and the members of the subclasses, Plaintiffs and the members of the subclasses are entitled to application of the continuing violations doctrine to all violations alleged herein.

1669.10 0140 BSC.DOC

93. As a result of Defendants' conduct alleged in this complaint, Plaintiffs and the members of the subclasses have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, and other financial loss, as well as humiliation, embarrassment, emotional and physical distress, and mental anguish.

94. By reason of Defendants' discrimination, Plaintiffs and members of the subclasses are entitled to all legal and equitable remedies available for violations of 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, including an award of punitive damages.

95. Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the subclasses, pray for relief as follows:

A. For an order declaring that the practices and policies of Defendants set forth in this complaint violate the rights of Plaintiffs and members of the subclasses under title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981, as amended;

B. For injunctive and equitable relief restraining Defendants from illegally discriminating against Plaintiffs and members of the subclasses, providing Plaintiffs and members of the subclasses the benefits that they would have received but for the illegal discrimination of the Defendants, and ordering Defendants to restrain from retaliation against Plaintiffs, the members of the subclasses, or any other person for participating in or supporting this litigation in any manner;

C.     For judgment against the Defendants and in favor of Plaintiffs and the members of the subclasses for all equitable monetary relief available under the law, including but not limited to back pay and front pay in amounts to be determined at trial;

D.     For judgment against the Defendants and in favor of Plaintiffs and the members of the subclasses for all compensatory and punitive damages available under the law, in amounts to be determined at trial;

E.     For an award of attorneys' fees and costs to the extent permitted by law;

F.     For pre-judgment and post-judgment interest;

G.     For such other and further relief as the Court deems just and equitable; and

H.     For an order retaining jurisdiction for five years or until such earlier time as the Court is satisfied that Defendants have remedied the practices and policies set forth in this complaint and determined to be in full compliance with the law.

1669.10 0140 BSC.DOC

DATED: January 24, 2005.

CAROLYN CALENDER, THEODOSIIA
KNAULS, MICHAEL MARION, RONNIE
MITCHELL, EVALEAN MOORE, BRIAN TODD,
RALPH WILSON, WILLIE WILSON, individually
and on behalf of all others similarly situated,

By: _____
One of their attorneys

Elizabeth A. Fegan (ARDC No. 06229226)
Timothy A. Scott (ARDC No. 06243846)
HAGENS BERMAN LLP
60 W. Randolph St., Suite 200
Chicago, IL 60601
(312) 762-9286
Email: beth@hagens-berman.com
       tims@hagens-berman.com

Steve W. Berman (ARDC No. 3126833)
Craig R. Spiegel (ARDC No. 3128238)
Jeffrey T. Sprung
Ivy D. Arai
HAGENS BERMAN LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292
Fax: (206) 623-0594
Email: steve@hagens-berman.com
       craig@hagens-berman.com

Attorneys for Plaintiffs